IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS


RONDA P. HUNTER
                    Plaintiff,


        Vs.                                        No. 06-4115-SAC


KAW VALLEY ELECTRIC
COOPERATIVE, INC.,

                    Defendant.

MEMORANDUM AND ORDER

        This is an employment discrimination case brought on claims of

sex discrimination in violation of Title VII of the Civil Rights Act of 1964,

("Title VII"), 42 U.S.C. §  2000e, *et seq*., and the Kansas Act Against

Discrimination, ("KAAD"), K.S.A. 44-1001 *et seq*.  The case comes before

the court on the defendant's motion for summary judgment.  (Dk. 37).

        The plaintiff, Ronda P. Hunter ("Hunter"), worked for Kaw Valley

Electric Cooperative ("KVEC") from May 29, 1990, until her termination in

November of 2005.  Ms. Hunter alleges that as a result of her gender,

KVEC's General Manager ("GM") refused to interview and/or hire her for

the Chief Financial Officer ("CFO") opening and she was terminated her

from the position of plant accountant approximately two months later.  The

defendant contends that the plaintiff was not interviewed because she

lacked the qualifications preferred by KVEC's GM and that the plaintiff was terminated for undermining management and spreading rumors. The defendant seeks summary judgment arguing that as a matter of law the plaintiff is unable to carry her burden of proving a prima facie case of discrimination and is unable to come forward with sufficient evidence for a reasonable jury to find the defendant's articulated nondiscriminatory reasons are pretextual.

**SUMMARY JUDGMENT STANDARDS**

A court grants a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure if a genuine issue of material fact does not exist and if the movant is entitled to judgment as a matter of law. The court is to determine "whether there is the need for a trial-whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will . . . preclude summary judgment." *Id.* There are no genuine issues for trial if the record taken as a whole would not persuade a rational trier of fact to find for the nonmoving party. *Matsushita*

*Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

In applying this standard, "[a]ll inferences arising from the record before us must be drawn and indulged in favor of the [nonmovant]." *Stinnett v. Safeway, Inc.*, 337 F.3d 1213, 1216 (10th Cir. 2003) (internal quotation marks omitted).  "Credibility determinations [and] the weighing of the evidence . . . are jury functions, not those of a judge."  *Id.* at 1216 (internal quotation marks omitted). Nevertheless, "the nonmovant must establish, at a minimum, 'an inference of the existence of each element essential to [her] case.'"  *Croy v. COBE Laboratories, Inc.*, 345 F.3d 1199, 1201 (10th Cir. 2003) (quoting *Hulsey v. Kmart, Inc.*, 43 F.3d 555, 557 (10th Cir. 1994)).  Put another way, the non-movant "must still identify sufficient evidence requiring submission to the jury to survive summary judgment."  *Piercy v. Maketa*, 480 F.3d 1192, 1197 (10th Cir. 2007).

The summary judgment movant bears the initial burden of pointing "to those portions of the record that demonstrate an absence of a genuine issue of material fact given the relevant substantive law."  *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.), *cert. denied*, 506 U.S. 1013 (1992).  If this burden is met, the nonmovant must "set forth specific facts' that would be admissible in evidence in the event of

3

trial from which a rational trier of fact could find for the nonmovant." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998). (citations omitted). "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.* Only admissible evidence may be reviewed and considered in a summary judgment proceeding. *See Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1541 (10th Cir. 1995). Conclusory allegations alone cannot defeat a properly supported motion for summary judgment. *White v. York Intern. Corp.*, 45 F.3d 357, 363 (10th Cir.1995). The nonmovant's "evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise." *Bones v. Honeywell Intern., Inc.*, 366 F.3d 869, 875 (10th Cir.2004).

The summary judgment inquiry is essentially "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

4

**STATEMENT OF UNCONTROVERTED FACTS**

The plaintiff Hunter began working for KVEC in May of 1990 as the front desk receptionist.  She moved to accounts payable in the fall of 1990 and assumed the position of plant accountant in July of 1995.  She worked as the plant accountant until her termination in November of 2005.  She was supervised in her work by the Chief Financial Officer ("CFO") Ken Gibbon until his retirement at the end of August of 2005.  Dan O'Brien was KVEC's general manger ("GM") throughout the plaintiff's employment.

Several years before his retirement, CFO Gibbons began coaching Hunter on improving her skill sets, getting more experience with different assignments, and completing her college degree if she wanted to hold some kind of office manager position.  Gibbon described that the plaintiff had assisted in gathering data for financial planning and forecasting, in gathering data for work orders related to loan applications, in preparing the basic RUS Form 7 for monitoring financial condition,  and in preparing tax returns.  Once Gibbon announced his retirement plans on August 17, 2005, the plaintiff Hunter spoke with him about applying for the CFO position.

Acting on Gibbon's announcement, GM O'Brien published the

CFO job description and opening on the National Rural Electric

Cooperative Exchange ("NRECA").  The following appeared in that job

posting:

> The successful candidate must have a bachelor's degree in
> accounting, business or finance.  Background in the electric utility
> industry and experience in Rural Utilities Service (RUS) accounting is
> desired.  A CPA is desired, yet not required.
> Established proficiency in financial analysis along with proven
> analytical and spreadsheet development skills necessary.

(Dk. 35, Ex. 2F).  KVEC adopted this job description for CFO from the one

developed by the NRECA.  In response to the posting, KVEC received

eight applications,  including the plaintiff's.  Only one of the applicants,

however, was a certified public accountant ("CPA").

With her application on August 29, 2005, the plaintiff submitted

a letter of recommendation from the outgoing CFO Gibbon.  The letter

reads:

> I have worked closely with Ronda for the past fifteen years in
> the Chief Financial position.  Ronda has shown great interest in
> learning the financial and accounting procedures of Kaw Valley
> Electric.  The past five to seven years Ronda has taken on many
> more duties in her job that have greatly helped me.  She shows a
> willingness to learn and is a quick learner.  She has assisted me in
> many of my duties as Chief Financial Officer.
> Ronda graduated this past May from Baker University with
> honors.  It is my opinion she would be a valuable asset to Kaw Valley
> Electric in the Chief Financial Officer position.  With my decision to
> leave Kaw Valley I am recommending Ronda for the Chief Financial

6

Position.

(Dk. 34, Ex. 7).  GM O'Brien met with CFO Gibbon to discuss Hunter's

application and Gibbon's letter of recommendation.[1]  O'Brien's impression

from the meeting was that Gibbon had not "strongly recommended" Hunter

and that both had agreed Hunter's resume went too far in taking

unqualified responsibility for completing two of the listed forms when her

role was actually limited to providing information or gathering data found in

the report.  O'Brien also told Gibbon that he wanted a CFO with Gibbon's

skill set and that he would like someone who was a CPA.  Gibbon said he

responded that if O'Brien considered the CPA a "key factor" for the CFO,

then Hunter was not qualified.  In his deposition, O'Brien testified it was his

goal to hire a CFO who had the education, abilities and skills of a CPA,

someone like Gibbon.

On GM O'Brien's request, the Board of Trustees approved

retaining a personnel agency to assist the GM in the search for a new

CFO.  On August 30, 2005, GM O'Brien met with Mr. Brown from the

---

[1]The defendant's motion erroneously cites Hunter's deposition as
supporting certain statements made during this conversation.  (Dk. 34, p.
4).  Hunter obviously wasn't a  party to this conversation, and the
statements appear to match attached excerpts of O'Brien deposition.  The
defendant's attachment is missing page nineteen of O'Brien's deposition
which impacts the court's statement of uncontroverted facts.

personnel agency.  Brown provided O'Brien with fourteen more candidates all of whom either had degrees in accounting or were CPAs.  There were three female candidates on this list, but none of the fourteen had worked for an electric cooperative.  O'Brien told Brown to wait on scheduling any interviews as he first wanted to interview Ron Baxa, one of the eight applicants responding to the NRECA posting and the only applicant of that group who was a CPA.  O'Brien told Brown that Baxa was an ideal candidate as he was not only a CPA but had been the finance and accounting manager for 15 years for a sister electric cooperative in Minnesota.

Believing that Baxa was the ideal candidate for the CFO opening, O'Brien interviewed only Baxa for the position.  The interview occurred on September 6, 2005, and O'Brien offered Baxa the job on the same day.  No one on the KVEC Board questioned O'Brien's decision to hire the only applicant who was interviewed for the position.  Baxa's first day of work at KVEC was October 3, 2005.

O'Brien has testified that he did not interview the plaintiff Hunter for the opening because he wanted a person who was a CPA in the CFO position, because he doubted Hunter's experience and skills in supervision,

8

organization and policy-making, and because he believed she lacked practical decision-making experience in finance.  The plaintiff responds that her experience and skills are demonstrated in that she had been performing many of the CFO's responsibilities under Gibbon's supervision. She completed some financial forms herself, prepared and readied accounting documents for the annual audit, and assisted Gibbon with financial forecasting.  Gibbon recognized the plaintiff had some supervisory experience in the areas of record retention and part-time summer help. The plaintiff points to her college degree in Business Administration she had received just five months earlier.

Ms. Hunter believes GM O'Brien did not interview her for the CFO position because she was a woman and because the "good old boy atmosphere" at KVEC bars any woman from serving in a management position.  In light of the plaintiff's opinion, the defendant points to the following, none of which the plaintiff controverts.  No one told the plaintiff she was not interviewed because of her gender.  The plaintiff knows of no documentary evidence in support of her opinion.  Prior to November of 2005, she is not aware of anyone having complained to O'Brien that woman would not be seriously considered for a management position.  The

9

plaintiff knows of no other qualified female applicant for a management position at KVEC who was denied an interview.  The plaintiff is not aware of anyone who can testify in support of her opinion that she was denied an interview because of her gender.  The plaintiff recognizes that Baxa was qualified for the CFO position but she does not consider Baxa to have been more qualified than her because she had 15 years of experience at KVEC.

Effective October 1, 2005, all KVEC employees, including the plaintiff, received a three percent cost of living raise.  Mr. Baxa became Ms. Hunter's supervisor when she returned to work on October 10, 2005. Shortly after returning from her vacation during the first week of October, the plaintiff Hunter complained to a co-employee, Ms. Bervert, that Mr. Baxa had a different management style, was very demanding, and had a rude and demanding tone.  Ms. Hunter also told Ms. Bervert that she didn't think Baxa knew what he was doing and that he was assigning her work because he didn't know how to do it.  Ms. Hunter revealed to Ms. Bervert that she intended to track Mr. Baxa in order to show that he did not know what he was doing.

On October 14, 2005, Ms. Hunter made a written request to GM O'Brien for a salary increase.  O'Brien denied the request.  On October 17,

10

2005, Ms. Hunter complained to O'Brien that Baxa did not know how to complete a Form 7, KVEC's monthly financial statement.

On November 7, 2005, Baxa telephone GM O'Brien who was on vacation.  Baxa complained that there had been a closed door meeting in the office of Jerry Manning, the manager of customer services, involving Manning, the plaintiff Hunter, Kim Howbert and Raelynn Bervert.  When Baxa asked Hunter about this meeting, she refused to discuss it with him.  O'Brien told Baxa he would call Manning.

Manning told O'Brien that the plaintiff came to him on November 7th saying she and the two other women were going to quit because of Baxa.[2]  Ms. Hunter and Ms. Bervert came together to Manning's office later the same day to complain that Baxa had sent a harsh e-mail to an IT support company technician and that KVEC's working relationship with another support company was in jeopardy because of Baxa.  On November 9th, O'Brien went into work and was met by Randy Richards, the manager of Safety and Materials, who said that Ms. Hunter had come to Mr. Richards on November 7th saying that Rusty with NISC

_____

[2]What the plaintiff cites in her deposition at pages 85 and 86 does not directly controvert what the Manning said the plaintiff had told him.  In particular, it does not controvert the plaintiff having told Manning that Ms. Bervert and Ms. Howbert were going to quit because of Baxa's actions.

wanted to be removed from KVEC's conversion and that Mr. Richards

should call him.  Mr. Richards said he did not call Rusty.

Later on November 9th, O'Brien called a meeting with Manning,

Richards and Baxa to discuss what had been happening.  O'Brien then

spoke with the employees involved, including the plaintiff, and concluded

that the e-mails sent to the IT technician were not harsh, that Rusty did not

want to be removed KVEC's conversion,[3] and that Ms. Bervert and Ms.

Howbert had no intention of quitting their jobs.   Based on these findings,

GM O'Brien concluded that the plaintiff Hunter was intentionally making

false statements in an effort to undermine KVEC management.[4]

Considering his findings, the plaintiff's discipline in 2000 for rumors, and

Baxa's impression that he could no longer trust the plaintiff, O'Brien asked

──────────────────

[3]The plaintiff's citation to what Mr. Haugh may have told her does not
controvert what Mr. O'Brien learned about the plaintiff's representation to
Mr. Richards that Rusty wanted to be removed from the conversion
projection because of Baxa.

[4]The plaintiff's cites from her deposition at page 97 her testimony that
Baxa made false statements about her to O'Brien in support of her
termination.  This does not controvert what O'Brien learned directly from
speaking to Rusty, Ms. Howbert or Ms. Bervert.  Nor does it controvert
what he concluded from reading the e-mails.  Moreover, the cited testimony
lacks sufficient specificity as to controvert the facts stated in the
defendant's motion.

Hunter to resign and eventually terminated her when she did not resign.[5]

It is uncontroverted that the plaintiff is claiming she was terminated on basis of her gender based in part on the following assertions. Baxa referred to the women in his office as "his girls." Baxa used demeaning behavior toward women. Baxa sneaked around the office to watch the plaintiff's movement. Baxa stood around corners to overhear the plaintiff's conversations. The plaintiff was denied the chance to defend against Baxa's allegations. Male employees were allowed to raise issues with management and were not fired after doing so.

**CLAIMS**

The pretrial order reflects the plaintiff is bringing two claims as theories for recovery. First, the plaintiff seeks recovery on the claim that the defendant discriminated against her on the basis of her female gender in denying her an interview and refusing to hire her for the CFO position. Second, the plaintiff seeks recovery on the claim that the defendant discriminated against her on the basis of her female gender in terminating

---

[5]According to O'Brien, the plaintiff had told Baxa that she would resign, but the plaintiff testified in her deposition that she told no one at KVEC that she "intended to quit or . . . to resign" prior to November 14, 2005. (Hunter Dep. p. 86). This fact is controverted, but does not appear material except as evidence of Baxa's treatment of the plaintiff.

her employment.

## APPLICABLE LAW

Title VII provides that "[i]t shall be an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual . . . because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1).  *Etsitty v. Utah Transit Authority*, 502 F.3d 1215, 1220 (10th Cir. 2007).  Because the plaintiff puts forth only circumstantial evidence, the court must apply the framework set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973).  *Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005).  The plaintiff must establish a prima facie case of a prohibited employment action by a preponderance of the evidence.  *Plotke*, 405 F.3d at 1099.  This is a *de minimis* burden, for it is only one of production that does not involve any assessments of credibility.  *Id*.

A prima facie case is a flexible standard and its articulation adjusted to fit "the context of the claim and the nature of the adverse employment action alleged."  *Plotke*, 405 F.3d at 1099.  The prima facie case serves to eliminate "the most common nondiscriminatory reasons for" a particular adverse employment action and to provide "a logical

14

connection" between its elements and the inference of discrimination. *Id.* at 1099-1100. Thus, to establish a prima facie case, the plaintiff typically must show: (1) that she is in a protected class, (2) that she was qualified for the position or benefit at issue, (3) that she suffered an adverse employment action, and (4) that the adverse employment action "occurred under circumstances which give rise to an inference of unlawful discrimination." *Swackhammer v. Sprint/United Management Co.*, 493 F.3d 1160, 1166 (10th Cir. 2007) (quoting *Plotke v. White*, 405 F.3d at 1100). The Tenth Circuit has summarized some of the more common circumstances giving rise to an inference of a discriminatory motive:

> "actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus ..., preferential treatment given to employees outside the protected class ..., in a corporate downsizing, the systematic transfer of a discharged employee's duties to other employees ..., or a pattern of recommending the plaintiff for positions for which she is not qualified [or over-qualified] and failure to surface plaintiff's name for positions for which she is well-qualified. A plaintiff might also rely upon the fact that the defendant, following plaintiff's termination, continued to seek applicants to fill the position, ... or, more generally, upon the timing or sequence of events leading to plaintiff's termination.

*Plotke*, 405 F.3d at 1101 (quoting *Chertkova v. Connecticut General Life Ins.*, 92 F.3d 81, 91 (2d. Cir. 1996)).[6] A prima facie case "raises an

───────────────

[6]In the failure to hire context, the fourth factor may be that after rejecting the plaintiff "the employer continued to seek applicants from

inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on consideration of impermissible factors."  *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 577 (1978).

If the plaintiff meets this prima facie case, the burden shifts to the employer to state a legitimate, nondiscriminatory reason for its adverse employment action.  *See Fischer v. Forestwood Co., Inc.*, 525 F.3d 972, 979 (10th Cir. 2008).  If the employer meets this burden of production in offering a legitimate rationale for the decision resulting in the adverse employment action, then summary judgment is warranted unless the employee can show there is a genuine issue of material fact as to whether the employer's proffered reasons are a pretext for discrimination.  *Berry v. T-Mobile USA, Inc.*, 490 F.3d 1211, 1220 (10th Cir. 2007).  In *Berry*, the court said this about pretext:

> A pretext argument requires the court to "examine the facts as they appear to the person making the decision," to determine whether the employer "honestly believed those reasons and acted in good faith upon those beliefs."  *Rivera v. City & County of Denver*, 365 F.3d

persons of [plaintiff's] qualifications."  *Garrison v. Gambro, Inc.*, 428 F.3d 933, 937 (10th Cir. 2005).  In the termination context, the fourth factor may be that the employee was replaced by someone not in the protected class. *See Adamson v. Multi Community Diversified Services, Inc.*, 514 F.3d 1136, 1146 (10th Cir. 2008).

912, 924-25 (10th Cir. 2004) (internal quotations omitted).  Our inquiry does not review the wisdom or fairness of the employer's proffered reasons.  *Id.*  "[A]t issue is whether the evidence of Plaintiff's misconduct presented to [the decisionmakers] was so weak that a rational factfinder could infer that [the] expressed reason for terminating Plaintiff must have been pretextual."  *Id.* at 925.

490 F.3d at 1220.  Another common way in this circuit of discussing the

employee's burden is:

> A plaintiff shows pretext by demonstrating such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted nondiscriminatory reasons.

*Swackhammer*, 493 F.3d at 1167 (quotation and citations omitted).  Thus,

in proving pretext, a plaintiff commonly resorts to evidence showing the

defendant's stated reasons are not true, the defendant did not comply with

company policy in its treatment of the plaintiff, or the defendant treated the

plaintiff differently from other similarly situated employees.  *Id.*

**REFUSAL TO INTERVIEW/HIRE FOR CFO OPENING**

On both claims, the defendant employer articulates its issue as

the plaintiff's inability to prove a prima facie case under Title VII.  The

defendant, however, advances no argument against the plaintiff's prima

facie case on her failure to interview/hire claim.  The summary judgment

record shows that the plaintiff is a woman who appears to have met the advertised minimum qualifications for the CFO opening, that she was not interviewed and not hired for the position, and that the defendant did interview and hire a man for the CFO opening.  With this showing, the burden of production moves to the defendant to articulate legitimate, non-discriminatory reasons for not interviewing and hiring the plaintiff.

As reflected in the court's statement of uncontroverted facts, GM O'Brien has offered many reasons for not interviewing and hiring the plaintiff.  First, O'Brien wanted a CPA, someone with the education, abilities and skills of a CPA, and someone like the retiring CFO Gibbon. O'Brien interviewed the one candidate who was a CPA and had accounting experience with a sister electric cooperative.  On the same day of the interview, O'Brien hired this candidate.  Second, O'Brien did not consider Gibbon to have given a strong recommendation in support of the plaintiff. Third, while recognizing the that the plaintiff had gained some experience on certain aspects of the CFO's responsibilities, O'Brien doubted her experience and skills in supervision, organization and policy involved with financial decisionmaking.  The defendant has successfully articulated legitimate, nondiscriminatory reasons for not interviewing/hiring the plaintiff.

18

In attempting to survive summary judgment, the plaintiff contends she has come forward with sufficient evidence from which a reasonable jury could rationally find that O'Brien's stated reasons are pretextual or so unworthy of belief as to infer that O'Brien did not act on them.  The court does not share the plaintiff's impression of her evidence and arguments.  A plaintiff may show pretext by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence" and therefore infer that the employer's actions were not for the reasons given.  *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1203 (10th Cir. 2006).

Ron Baxa was the only candidate who was a CPA with fifteen years of financial experience with a rural electric cooperative.  Based on Baxa's resume and application, O'Brien considered him the ideal candidate.  In interviewing only Baxa and hiring him on the same day, O'Brien's actions are hardly inconsistent with KVEC's advertised preferences for a candidate who was a CPA with a background in the electric utility industry, experience with rural utilities service, and with

19

established proficiency in financial analysis.  O'Brien's failure to interview other CPA applicants does not evidence any discriminatory use of this preference.  The record does not show the gender of the other CPA applicants or whether they had any financial experience with rural electric utilities.  For that matter, the plaintiff makes no attempt at showing that O'Brien's stated preferences were unreasonable for the CFO position or that her qualifications and experience were superior or even equal to Baxa's.

The court finds no evidence of pretext in O'Brien's handling of Gibbon's letter of recommendation for the plaintiff.  Before hiring Baxa, O'Brien met with Gibbon and discussed the plaintiff's application, her work performance, her work experience, and his letter of recommendation. While the plaintiff may want the letter to speak for itself, Gibbon and O'Brien testified about their conversation during which they shared their impressions of plaintiff's experience and qualifications for the job. O'Brien's impression from this meeting was that Gibbon had not given a strong recommendation of the plaintiff.  Gibbon's deposition testimony appears consistent with this impression.  He and O'Brien agreed the plaintiff would have to "grow into the position" and was not a candidate who

20

would be able to "hit-the-ground running."  (Dk. 49-6, p. 73).

For many of the same reasons, a genuine issue of material fact on pretext does not emerge by adding the plaintiff's disagreement with O'Brien's assessment of her experience to the totality of these circumstances.  *See Petersen v. Utah Dept. of Corrections*, 301 F.3d 1182, 1190-1191 (10th Cir. 2002) (employee's personal opinion about her experience and qualifications does not create a material issue of fact on pretext).  Not only was O'Brien generally familiar with plaintiff's job duties, but he also discussed them with Gibbon following the plaintiff's application.  *See Santana v. City and County of Denver*, 488 F.3d 860, 865 (10th Cir. 2007) (pretext assessed from the facts appearing to the decisionmaker).  What the plaintiff points out as areas of disagreement do not suggest any deliberate effort by O'Brien to ignore or misstate the plaintiff's experience as the plant accountant.  It is true Gibbon certainly wanted the plaintiff to be interviewed so that O'Brien would more fully appreciate Hunter's understanding of the CFO position.  Gibbon, however, conceded to O'Brien that the plaintiff's experience and skill were not such that she could handle all the CFO responsibilities immediately.  The record is uncontroverted that O'Brien did interview and hire a person who appeared to have the

21

accounting skills and the experience to perform the CFO responsibilities immediately.  The plaintiff has failed to come forward with direct evidence giving rise to genuine issues of material fact over the falsity of each of the defendant's proffered reasons for not interviewing and hiring her.

The plaintiff contends she has additional evidence that sheds light on the defendant's real motive behind this employment decision.  (Dk. 46, pp. 23-24).  The plaintiff throws out that KVEC has never had a woman manager.  The defendant challenges this assertion by citing Ms. Bervert as a supervisor of office services.  Even assuming the plaintiff is right on this score, it is difficult to ascribe any real evidentiary value to the absence of a woman manager without knowing whether any qualified female applicants were denied an interview and not hired for an open manager position.  The plaintiff offers nothing from which to infer that adverse employment actions explain the absence of women managers at KVEC and that these actions bear a logical nexus to the plaintiff's allegations of discrimination.

The plaintiff also points to the defendant's treatment of Ms. McCulloch in having her establish the call center for emergency calls but not giving her the title of manager of the call center and then not paying her overtime when the lineman called out on the jobs were paid overtime.  (Dk.

46, pp. 23-24).[7]  This evidence is again deficient in providing any reasonable inferences of a discriminatory motive relevant to the plaintiff's claims.  The record does not show that a manager position for the call center ever existed or that the circumstances surrounding the decision to create such position are suspicious enough to suggest a discriminatory motive.  As for overtime pay, KVEC began paying Ms. McCulloch overtime after she requested it from her supervisor.  Neither circumstance necessarily suggests a discriminatory motive, nor does the plaintiff offer an explanation or argument to link these events to her claims.

Finally, the plaintiff asserts "[s]exual harassment and intimidation against females including the Plaintiff is ignored or dealt with in a cursory manner."  (Dk. 46, p. 23).  The plaintiff's citations do not show that KVEC management ignored or lightly handled incidents of sexual harassment and intimidation.  The cited testimony indicates that management upon receiving such a complaint did confront the male co-employee and that similar incidents did not occur again.  The mere fact that

---

[7]The plaintiff also refers without citation to the "[d]efendant's management has stated in safety meetings that certain of its jobs in the line department are men's jobs."  (Dk. 46, p. 23).  The plaintiff offers nothing in support of the making of this comment or its context as to suggest this would be evidence of a discriminatory motive likely to be involved also in the hiring of department managers.

23

the plaintiff has a different opinion on the appropriate discipline or reprimand for such behavior does not give rise to a rational inference of a discriminatory motive.

Putting together what the plaintiff has mustered to show that the employer's proffered reasons are false, the court believes this evidence is simply too thin for a reasonable jury to infer a discriminatory motive.  The plaintiff offers a scintilla of evidence that is devoid of context and background as to sustain any rational inferences of pretext.  The record conclusively reveals KVEC's non-discriminatory reasons for not interviewing and hiring the plaintiff for CFO, and the plaintiff's evidence fails to establish a genuine issue of material fact on pretext.   The defendant is entitled to summary judgment on this claim.

**TERMINATION**

The defendant argues for summary judgment in that the plaintiff cannot prove she was performing satisfactory work as part of her prima facie case and is unable to meet her burden of showing the defendant's reasons for discharging her were pretextual.  The plaintiff does not respond separately to the defendant's arguments.  Instead, the plaintiff argues against summary judgment on the following grounds.  (Dk. 46, pp. 24-25).

24

The plaintiff believes a material factual dispute exists over whether Baxa falsely accused her of spreading false rumors about him.  The plaintiff denies spreading false rumors as she was acting appropriately in informing a manager of a vendor problem.  The plaintiff contends her discharge was disparate treatment because male employees who sexually harassed and discriminated against female employees were not discharged.  Finally, the plaintiff insists O'Brien's interrogation and effort to secure her resignation is evidence of pretext, as he lacked a plausible ground for termination and wanted her resignation in order to cover up his discriminatory motive.

The court will assume the plaintiff is arguing each of the above circumstances give rise to an inference of discrimination for purposes of a prima facie case.  Since the prima facie case is a minimal burden, the court will treat the combined circumstances as sufficient for a prima facie case. GM O'Brien discharged the plaintiff after determining that she was spreading false rumors about the new CFO in an effort to undermine the management.  After conducting his own investigation which included interviewing all involved employees and affected persons and reading certain e-mails, O'Brien found the plaintiff had told false rumors that some employees were going to quit because of Baxa, that Rusty wanted to be

25

removed from a computer conversion project because of Baxa, and that Baxa had sent harsh e-mails to another support company.  O'Brien concluded that the plaintiff had made these false statements in order to undermine the new CFO.

The court does not understand how the plaintiff believes her deposition testimony that Baxa lied to O'Brien about her spreading false rumors shows O'Brien's reasons for discharging her are pretextual.[8]  The plaintiff does not controvert that O'Brien specifically spoke with others to whom the plaintiff had made certain statements about Baxa.  The plaintiff does not controvert that O'Brien learned that the named employees did not want to quit because of Baxa, that Rusty did not want off the project because of Baxa, and that Baxa's e-mails were not harsh.  The plaintiff offers no evidence or arguments tending to show that O'Brien terminated the plaintiff in reliance on any representation by Baxa that the plaintiff was spreading false rumors about him.[9]

---

[8]The cited testimony is hardly more than speculation, as the plaintiff does not identify what alleged false statements were made by Baxa and how she knows those statements were made.

[9]As summarized in the court's statement of uncontroverted facts, the plaintiff asserted during discovery that she considers Baxa's actions towards her to be evidence of pretext on her discharge claim.  The plaintiff's written memorandum, however, does not argue these

26

The summary judgment record establishes that in 2000 a co-employee filed a complaint that a rumor was being spread in the workplace that she had found her husband in bed with another woman.  O'Brien investigated the complaint.  He determined the source of the untrue rumor was the plaintiff.  In disciplining the plaintiff for this rumor, O'Brien and Gibbon warned the plaintiff that she could be terminated if caught spreading rumors about other employees.  The plaintiff contends it is evidence of pretext for O'Brien to refer back to this dated disciplinary action as partial justification for his discharge.  The dated nature of this disciplinary warning is little evidence of pretext, particularly when O'Brien only referenced it as a background for discharging the plaintiff for her current acts of insubordination.

In her memorandum, the plaintiff summarily denies spreading false rumors.  As already summarized above, it is uncontroverted that O'Brien investigated and confirmed that the plaintiff spread rumors about

_____

circumstances as evidence of pretext.  The summary judgment record also fails to develop the relevance of those circumstances to the issue of pretext.  These other circumstances are too isolated, vague and conclusory as to cast doubt on the defendant's actual motive for discharging the plaintiff.  Moreover, the plaintiff does not show through the summary judgment record how Baxa's alleged conduct materially influenced O'Brien's discharge decision.

27

Baxa which were not true.  Whether or not Jim Haugh came to the plaintiff

with concerns about Baxa is not a fact that makes her other rumors about

Baxa true.

The plaintiff argues pretext in that male employees who

sexually harassed female employees were not terminated.  Regarding such

evidence, the general rule is:

> A plaintiff also may show pretext by providing evidence that he was
> treated differently from other similarly situated, nonprotected
> employees who violated work rules of comparable seriousness,
> provided the similarly situated employee shares the same supervisor,
> is subject to the same performance standards, and otherwise faces
> comparable relevant employment circumstances.

*E.E.O.C. v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 489

(10th Cir. 2006) (quotations and citations omitted), *cert. dismissed*, 127 S.

Ct. 1931 (2007).  The plaintiff's offer of disparate treatment evidence here

makes no attempt at meeting this established standard.  The court is in no

position of presuming the plaintiff's evidence could meet this standard.  For

example, a comparable relevant employment circumstance would be

whether a male employee had received a disciplinary warning for a prior

violation.  The plaintiff's evidence simply does not sustain an inference of

pretext.

Finally, the plaintiff argues the defendant's credibility is suspect

28

in that instead of discharging the plaintiff immediately, O'Brien attempted to persuade the plaintiff into resigning.  The plaintiff offers no legal authority for the sweeping proposition that an employer's reasons for discharge may be pretextual if the employer gives the employee the chance to resign first rather than being discharged.  O'Brien prepared a letter of resignation and directly asked the plaintiff to sign it.  When the plaintiff refused, O'Brien gave her time to consider his offer.  In doing so, O'Brien plainly and consistently communicated that he did not believe the plaintiff should remain employed at KVEC due to her acts of insubordination.  From the circumstances of this case, the court sees no inconsistency or contradictory position involved in first asking the plaintiff to sign the letter of resignation and then terminating her only later after she ultimately refuses to sign the letter.

"Even though all doubts concerning pretext must be resolved in plaintiff's favor, a plaintiff's allegations alone will not defeat summary judgment.  Mere conjecture that the employer's explanation is pretext is insufficient basis to defeat summary judgment."  *Jencks v. Modern Woodmen of America*, 479 F.3d 1261, 1267 (10th Cir. 2007) (citation and quotations omitted).  The court finds that plaintiff has failed to present facts

29

suggesting that the defendant's "proffered reasons were so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude the reasons were unworthy of belief." *Young v. Dillon Companies, Inc.*, 468 F.3d 1243, 1250 (10th Cir. 2006).  Considering all the evidence of pretext offered and specifically argued by the plaintiff in her memorandum, the court concludes the plaintiff has failed to carry her burden at the pretext phase of the *McDonnell Douglas* analysis and to create an inference of discrimination being the actual motivation to her discharge.  Having reviewed all evidence of record, the court finds that the defendant is entitled to summary judgment on this claim.

IT IS THEREFORE ORDERED the defendant's motion for summary judgment (Dk. 37) is granted.

Dated this 30th day of September, 2008, Topeka, Kansas.


s/ Sam A. Crow
Sam A. Crow, U.S. District Senior Judge